In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1440

JUANA VARGAS-HARRISON,

Plaintiff-Appellant,

v.

RACINE UNIFIED SCHOOL DISTRICT,
DENNIS McGOLDRICK, JOHN PELEJ, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 845--Rudolph T. Randa, Judge.

ARGUED SEPTEMBER 13, 2001--DECIDED November 30, 2001


  Before RIPPLE, ROVNER and EVANS, Circuit
Judges.

  RIPPLE, Circuit Judge.  Juana Vargas-
Harrison filed this action against her
employer, the Racine Unified School
District ("School District"), alleging
that the School District had violated her
First Amendment rights when it demoted
her for opposing publicly one of its
policies. The complaint also named the
School District's Superintendent Dennis
McGoldrick, Assistant Superintendent John
Pelej, and Director of School Operations
Patricia Stephens-Rogers (collectively
"Administrators") as individual
defendants to the suit. The district
court entered summary judgment for the
School District and its Administrators,
finding that Ms. Vargas-Harrison occupied
a policy-making position within the
school system. The district court
concluded that, because Ms. Vargas-
Harrison was a policy-making employee who
had engaged in speech critical of her
superiors' policies, the School District
could demote her without implicating her
First Amendment rights. The district
court also dismissed as moot Ms. Vargas-
Harrison's pending motion to amend her
complaint to include a procedural due
process claim against the School
District. For the reasons set forth in
the following opinion, we affirm the

judgment of the district court.

I

BACKGROUND

A.  Facts

   In the fall of 1998, Ms. Vargas-Harrison became the principal of Knapp Elementary, a grade school located in the Racine Unified School District. As the head administrator at Knapp, Ms. Vargas-Harrison evaluated the school's personnel, provided guidance in curriculum and instructional development, and implemented the policies of the Board of Education. In addition, the School District required each of its principals, including Ms. Vargas-Harrison, to spearhead the development of a P-5 grant proposal for his or her school.

   The P-5 Program is a legislative program of the State of Wisconsin that offers financial aid to public schools serving disadvantaged children. For a school to receive this funding, the local school board, on its own initiative or by appli cation of the principal, petitions the State for a P-5 grant. Although the proposal must detail how the school intends to spend the funds, Wisconsin does not mandate any particular use for the grant. To the contrary, each school has wide discretion in crafting its own proposal. In the case of Knapp Elementary, this discretion fell to its principal, Ms. Vargas-Harrison.

   On April 22, 1999, Ms. Vargas-Harrison presented her initial P-5 proposal to the School District's Curriculum and Instruction Committee ("Committee"). The proposal suggested using the P-5 grant to fund an alternative reading program. Ms. Vargas-Harrison's plan would mark a dramatic shift in the use of the funds because the proposal channeled money away from several teaching positions traditionally paid for by the grant. Confronted with the prospect of job cuts, the local teachers' union vehemently objected to Ms. Vargas-Harrison's proposal. Based on this opposition, the Committee did not approve Ms. Vargas-Harrison's plan.

   Dismayed with the outcome of the meeting, Ms. Vargas-Harrison contacted

her superior, Patricia Stephens-Rogers, and expressed frustration with the union's reaction to the proposal. However, Ms. Vargas-Harrison received little solace from the School District because it had been attempting to improve its relations with the union. Rather than supporting Ms. Vargas-Harrison's proposal, Stephens-Rogers directed Ms. Vargas-Harrison to collaborate with union officials in modifying the plan. Despite the admonition, Ms. Vargas-Harrison did not participate in the ongoing effort to recast Knapp's P-5 proposal. A group of parents and teachers, however, proceeded to cobble together a new plan without the assistance of Ms. Vargas-Harrison.

In the meantime, Ms. Vargas-Harrison continued to advocate her original plan. In particular, she sent a letter to the president of the local school board that detailed the deficiencies in the current use of the P-5 grant funds. As an alternative, she enclosed a copy of her rejected plan.

On May 25, 1999, a coalition of teachers and parents was scheduled to present their revised P-5 proposal to the Committee. The School District, however, recognized that Ms. Vargas-Harrison opposed the modification of her original plan. Therefore, on three separate occasions prior to the presentation, School District officials asked Ms. Vargas-Harrison to attend the meeting. Although the School District did not order her to participate in the presentation, its officials believed that Ms. Vargas-Harrison's presence would indicate her support for the revised proposal. For her part, Ms. Vargas-Harrison understood that the School District wanted her to support the proposal even if she did not agree with it.

At the May 25 public meeting, Ms. Vargas-Harrison disregarded the advice of her superiors. After the new plan had been presented, Ms. Vargas-Harrison received permission to speak to those gathered at the meeting. She proceeded to emphasize the flaws in the new proposal. Once again, Ms. Vargas-Harrison distributed copies of her original plan and offered it as an alternative to the new proposal. She indicated it was "time to let the principal do the job and stop

the union running the school." R.42 at 157.

Her stance was not well received by the School District. On two occasions, Ms. Vargas-Harrison met with School District officials concerning her conduct at the May presentation. Soon after these meetings, on June 18, 1999, the School District demoted her to the position of assistant principal at another institution. However, she would never serve in that position. Over the next seventeen months, Ms. Vargas-Harrison did not report to work; rather, she consumed her vacation days and various leave periods. After she had exhausted all possible excused absences and still had failed to return to her new position, the School District terminated her in January 2001.

B. District Court Proceedings

1.

On July 26, 1999, Ms. Vargas-Harrison filed suit against the School District and its Administrators, alleging that they had demoted her in retaliation for her public opposition to their preferred P-5 grant proposal. The district court denied Ms. Vargas-Harrison's initial request for a temporary restraining order that would have reinstated her as principal of Knapp Elementary. After a lengthy hearing, the district court also rejected Ms. Vargas-Harrison's motion for a preliminary injunction.

The School District and its Administrators then moved for summary judgment. They submitted that Ms.-Vargas-Harrison occupied a policy-making position within the school system. The School District argued that, because local school regulations unequivocally indicated that Knapp's principal had input into governmental decisionmaking, the court could resolve, as a matter of law, Ms. Vargas-Harrison's status as a policy-making employee. If Ms. Vargas-Harrison was a policy-maker, continued the School District, she owed her superiors a degree of loyalty with regard to job-related policy issues. The School District maintained that she had disregarded that duty when she criticized her superiors' preferred P-5 proposal. Because she was a policy-maker and

because her May 25 speech involved a matter of educational policy, the School District contended that the First Amendment did not protect her May 25 speech. Consequently, in its view, the demotion of Ms. Vargas-Harrison was constitutionally permissible.

In the alternative, the Administrators sought to be dismissed from the case on qualified immunity grounds. They maintained that the law concerning the precise scope of the policy-maker analysis was unrefined at the time of Ms. Vargas-Harrison's dismissal. They contended that a reasonable school official would not have recognized that Ms. Vargas-Harrison's demotion violated the Constitution.

In opposing the motion for summary judgment, Ms. Vargas-Harrison maintained that the record did not support a finding that she occupied a policy-making position within the school system. She also submitted that the Administrators were not entitled to qualified immunity because they had violated her clearly established right to speak on matters of public concern.

Before the district court rendered a judgment on the motion,/1 on January 18, 2001, the School District terminated Ms. Vargas-Harrison. It alleged that it had taken this action because Ms. Vargas-Harrison had not returned to work since her demotion eighteen months earlier. Ms. Vargas-Harrison, however, contended that the discharge gave rise to two new claims against the School District. Specifically, she maintained that the termination had not only amounted to retaliatory discharge but had also violated her right to procedural due process. As such, she sought from the district court leave to amend her complaint to incorporate these new allegations.

2.

Before the district court addressed Ms. Vargas-Harrison's motion to amend her complaint, it entered summary judgment for the School District and its Administrators. The district court held that, as a matter of law, Ms. Vargas-Harrison was a policy-making employee who had advocated publicly positions in conflict with her superiors' job-related

policy viewpoints. The School District therefore could demote and ultimately terminate Ms. Vargas-Harrison without impinging upon her First Amendment rights. In reaching its conclusions, the district court acknowledged that an individual's status as a policy-making employee generally poses a question of fact. However, because detailed regulations clearly delineated the duties and responsibilities of Knapp's principal, the district court determined that it could resolve the issue as a matter of law. The court also emphasized the discretion the School District had vested in Ms. Vargas-Harrison with regard to development of the P-5 proposal. In the view of the district court, these considerations permitted but one conclusion--Ms. Vargas-Harrison held a policy-making position within the School District and, because she was a policy-making employee, the School District could demote and ultimately terminate her for advocating stances in opposition to its stated policies.

The district court then turned to the two remaining aspects of the case. Although recognizing that its determination that Ms. Vargas-Harrison was a policy-maker disposed of the case, the district court nevertheless addressed the Administrators' claim of qualified immunity. The district court concluded that reasonable school officials would not have known that their demotion of Ms. Vargas-Harrison for opposition to their policies was unconstitutional. The court emphasized that the Administrators believed they were demoting a policy-making employee. The district court found that, even if the Administrators were wrong in that conclusion, the case law concerning the scope of the policy-maker analysis was not refined in 1999; the Administrators would not have known that their demotion of Ms. Vargas-Harrison was unconstitutional. Finally, the district court briefly addressed Ms. Vargas-Harrison's motion to amend her complaint to include procedural due process and retaliatory discharge claims. Without elaboration, it dismissed the pending motion as moot.

II

DISCUSSION

A.

We review de novo the district court's grant of summary judgment. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We must ask whether "there are genuine factual issues that can properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. In assessing whether a genuine issue of material fact exists, we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See id. at 255; Basith v. Cook County, 241 F.3d 919, 926 (7th Cir. 2001).

B.

We must determine whether the district court properly characterized Ms. Vargas-Harrison as a policy-maker and whether, as a matter of law, the School District's action violated her rights under the First Amendment.

As a general rule, the government cannot retaliate against its employees for engaging in constitutionally protected speech. See, e.g., Myers v. Hasara, 226 F.3d 821 (7th Cir. 2001). An employee may bring suit to vindicate his First Amendment rights provided two elements are present. The plaintiff must demonstrate that he engaged in speech protected by the First Amendment. See Horwitz v. Board of Educ. of Avoca Sch. Dist. No. 37, 260 F.3d 602, 618 (7th Cir. 2001); Ryan v. Ill. Dep't of Children & Family Servs., 185 F.3d 751, 758 (7th Cir. 1999). In addition, the employee must show his speech was "a substantial or motivating factor in the defendant's challenged actions." Horwitz, 260 F.3d at 618; see also Ryan, 185 F.3d at 758.

Failure to satisfy either element of the inquiry will prove fatal to the employee's claim. In this case, we must focus on the first prong of this inquiry.

It is well-established in our jurisprudence that a public employee does not shed his First Amendment rights at the steps of the government building. See Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). It is equally well-established, however, that a government employee does not enjoy unlimited freedom of expression with respect to matters that relate to official responsibilities. In Pickering, the Supreme Court of the United States set forth an approach designed to strike an appropriate balance between the rights of the government employee as a private individual with freedom of expression and the need of government to conduct its affairs effectively and efficiently. Pickering requires that we ask (1) whether the public employee spoke on a matter of public concern; and (2) whether "the interests of the [employee], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. The second prong of this inquiry, known as Pickering balancing, requires that we engage in a seven factor analysis, weighing the respective interests of the government and its employee, to determine if the First Amendment protects the speech at issue./2 See Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999). However, drawing from the principles established in the closely analogous area of patronage cases,/3 we have recognized that the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies. See Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995); Wilbur v. Mahan, 3 F.3d 214, 219 (7th Cir. 1993). In essence, we have determined that, with respect to these employees, the Pickering analysis regularly will result in a determination that "the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such

a degree that it obviates Pickering balancing." Bonds v. Milwaukee County, 207 F.3d 969, 977 (7th Cir. 2000). Consequently, there is no need for a fact-specific analysis of the circumstances of each case:

Legal proofs are not the only source of knowledge and decision. Categorical judgments based on experience and common sense play an important role in all areas of law. The exception recognized in the patronage cases for sensitive employees rests on such judgments and it retains its force in cases that have nothing directly to do with patronage or party affiliation. An elected official is entitled to insist on the loyalty of his policymaking subordinates . . . . It would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who do their best to serve those superiors faithfully but have the misfortune to belong to the wrong party. It would give policymaking employees and other sensitive employees an incentive to attack their bosses in order to retain their jobs.

Wilbur, 3 F.3d at 218-19.

C.

We next must decide whether this case falls within the ambit of this policy-maker corollary to the Pickering analysis. This inquiry requires that we determine whether Ms. Vargas-Harrison occupied a policy-making position, see Warzon, 60 F.3d at 1239, and whether her speech was of the kind that falls within the scope of the corollary. See Bonds, 207 F.3d at 979.

1.

A policy-making employee is one whose position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981). In applying this criterion, however, it is necessary to "go beyond labels to consider the nature of the responsibilities in question." See Pleva v. Norquist, 195 F.3d 905, 912 (7th

Cir. 1999) (internal quotation marks omitted). Simply put, an individual's job title will not decide her fate as a policy-making employee; rather, the actual duties of the position must be examined and evaluated. Because the unique characteristics of a job will often influence this determination, an individual's status as a policy-making employee frequently poses a fact question. See Soderbeck v. Burnett County, 752 F.2d 285, 288-89 (7th Cir. 1985). However, when the duties and responsibilities of a particular position are clearly defined by law and regulations, a court may resolve this issue without the aid of a finder of fact. See Pleva, 195 F.3d at 912.

Our decision in Warzon provides guidance on the application of this standard. In Warzon, the plaintiff, Maureen Warzon, served as the controller of Milwaukee County's Department of Administration--a position that entailed management of the entity's health care plan. See Warzon, 60 F.3d at 1235. At the time she took over the position, the plan was in crisis because it confronted severe budgetary shortfalls. See id. Warzon, at the request of her superiors, developed an initiative to improve the health system's financial situation. See id. However, her superiors rejected her idea and pursued other remedies. See id. at 1236. When Warzon publicly criticized her superiors' preferred methods for reforming the health system, she was terminated. See id. at 1236-37. In rejecting her First Amendment claim, we determined that Warzon served as a policy-making employee of Milwaukee County. See id. at 1240. We emphasized that Warzon's position entailed more than ministerial duties. See id. The plaintiff admitted that she was empowered to make recommendations concerning the plan including the development of new "policies and procedures" to improve the system. See id. at 1239. Although her superiors ultimately dismissed her recommendation, we stated that "the relevant inquiry is input, not control." See id. at 1240.

Turning to the facts of this case, we first note that no factual dispute exists concerning Ms. Vargas-Harrison's duties and responsibilities as principal at Knapp Elementary. To the contrary, School District regulations provide considerable

insight into her status as a policy-making employee. In particular, District Policy 2213 delineates the role Ms. Vargas-Harrison held within the School District. As principal, Ms. Vargas-Harrison served as the highest ranking school official at Knapp Elementary. In this position, she exercised discretion over the organizational structure of her school. She assisted in the selection, supervision and evaluation of the faculty at Knapp. The responsibility for leading the development of curriculum and instruction fell to her. These duties, in themselves, are far from ministerial.

Another aspect of her job also indicates that Ms. Vargas-Harrison had meaningful input into government decisionmaking on issues where there is room for principled disagreement. The development of the P-5 proposal indicates the scope of Ms. Vargas-Harrison's decisionmaking responsibilities. The School District assigned Ms. Vargas-Harrison the task of creating a P-5 proposal for Knapp Elementary. The statutory scheme behind the P-5 program provided each school with wide discretion in developing a grant proposal to fit its particular needs. Ms. Vargas-Harrison used that discretion to its fullest--discarding Knapp's traditional use of the funds in favor of an innovative exploitation of the grant. Although her superiors ultimately rejected the proposal, "the relevant inquiry is" whether she had "input, not control." Warzon, 60 F.3d at 1239. Ms. Vargas-Harrison's well-defined duties as principal at Knapp lead to one conclusion--she had significant input into government decisionmaking. We therefore conclude that she occupied a policy-making position within the School District.

2.

Although Ms. Vargas-Harrison's responsibilities fit the definition of a policy-maker, the question still remains whether she engaged in the type of speech that triggers this corollary to the Pickering analysis. We repeatedly have declined to decide whether a policy-maker may be terminated for speaking on any matter of public concern. See Bonds, 207 F.3d at 979; Ryan, 185 F.3d at 759; Warzon, 60 F.3d at 1239 n.1; Wilbur, 3 F.3d at 214. However, we have said that

the policy-maker corollary "does not apply, and the courts must apply Pickering balancing, when the speech at issue does not implicate the employee's politics or substantive policy viewpoints."/4 Bonds, 207 F.3d at 979.

This reluctance to cast the policy-maker corollary in sweeping terms stems from the rationale underlying it. As we noted earlier, the corollary is a shorthand for the Pickering balancing; in certain instances, "the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree" that the fact-specific Pickering inquiry is not required. Bonds, 207 F.3d at 977.

Therefore, we have concluded that this corollary applies when a policy-making employee engages in speech that implicates his political viewpoints. See Wilbur, 3 F.3d at 217-18. In such a situation, the friction between a politically adverse policy-maker and superior poses such a potential disruption to the efficient functioning of government that a fact-specific inquiry is unnecessary. Similarly, we have determined that the policy-maker analysis applies to situations where a policy-making employee engages in speech critical of his superiors' work-related policies. See Warzon, 60 F.3d at 1239. When the policy-maker's speech creates a conflict with the policy stance of his superiors, the effects on government are "acute." See id. By contrast, when the employee's speech addresses matters that have no impact on his official duties, there is a diminished threat that this expression will hamper the government's performance of its functions. In these circumstances, the corollary does not apply, and courts must apply the fact-specific Pickering balancing test when the speech at issue does not implicate the employee's politics or substantive policy viewpoints. Bonds, 207 F.3d at 979. "Speech unrelated to job duties or political viewpoint runs too remote from interests that animate the exception." Id.

Turning to the facts of this case, Ms. Vargas-Harrison's speech falls within the contours of the policy-maker corollary. Ms. Vargas-Harrison's speech on May 25

unequivocally concerned work-related policies. Ms. Vargas-Harrison advocated shifting the use of the P-5 funds from teachers' salaries to an alternative reading program. This stance placed her in square opposition to the stated goals and policies of her superiors. The School District's need for allegiance from Ms. Vargas-Harrison during the creation of the P-5 proposal was acute. The union's vehement opposition to Ms. Vargas-Harrison's proposal boded poorly for labor relations in the School District. The Committee's refusal to approve Ms. Vargas-Harrison's plan denied the School District much needed funding. This is the precise type of situation that implicates the policy-maker rule.

Accordingly, we hold that the district court correctly determined that Ms. Vargas-Harrison's opposition to the School District's efforts to secure approval of its P-5 program was not protected speech. As a policy-maker in the School District, she owed her superiors a duty of loyalty with respect to this subject. The First Amendment does not protect her against discharge based on her opposition to the School District's proposal./5

D.

Finally, we must address whether the district court properly dismissed as moot Ms. Vargas-Harrison's motion to amend her complaint. We conduct a de novo review of the district court's decision to dismiss as moot a motion to amend the complaint in light of the grant of summary judgment for the defendant. See Sanders v. Venture Stores, Inc., 56 F.3d 771, 773 (7th Cir. 1995). We are not bound by the rationale underlying the district court's determination. Rather, we may affirm the district court's judgment "on any ground that is supported in the record." Id. (citations omitted).

After her termination on January 18, 2001, the plaintiff sought leave to amend her complaint to include a procedural due process claim. She alleged, in the most conclusory manner, that her termination had deprived her of property without due process of law. In the course of dismissing her First Amendment count, the district court dismissed as moot all pending motions, including the motion to

amend the complaint to include this due process claim.

Ms. Vargas-Harrison correctly notes that the district court's dismissal of a First Amendment case does not necessarily moot a procedural due process claim. However, we nevertheless must affirm the dismissal because an examination of the proposed amended complaint and the record of the earlier preliminary injunction hearing make clear that the amendment would have been futile. See Forman v. Davis, 371 U.S. 178 (1962) (indicating leave to amend may be denied if new claim would be futile); Bethany Pharmacal Co., Inc. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001); Payne v. Churchich, 161 F.3d 1030, 1036 (7th Cir. 1998).

A new claim is futile if it would not withstand a motion to dismiss. See Bower v. Jones, 978 F.2d 1004, 1008 (7th Cir. 1992). The proposed amended complaint recites no basis for the assertion that Ms. Vargas-Harrison has a property interest in her job. Notably, there is no allegation that she is a tenured employee and, at the hearing on the preliminary injunction in the district court, her counsel specifically noted that she was "a non-tenured employee, has no civil service protection." R.42 at 205. The defendants noted this deficiency and the earlier admission by counsel in their brief and Ms. Vargas-Harrison has supplied no answer in her reply brief. Moreover, although Ms. Vargas-Harrison's proposed amended complaint is rather conclusory on this issue, it appears that the district court was correct in determining that, if a hearing had been held, she would have alleged the same retaliation claim that we hold non-meritorious today. As such, we hold that the district court's dismissal of Ms. Vargas-Harrison's motion to amend her complaint was appropriate.

Conclusion

Because Ms. Vargas-Harrison was a policy-making employee who had engaged in speech critical of her superiors' policies, we conclude that the School District's adverse employment action did not violate her First Amendment rights. We also conclude that the district court properly dismissed Ms. Vargas-Harrison's motion to amend her complaint.

Accordingly, the judgment of the district
court is affirmed.

AFFIRMED

FOOTNOTES

/1 The district judge who presided over the initial
phase of this litigation, including the hearing
on the preliminary injunction, became ill before
the conclusion of the case. The case therefore
was assigned to another judge whose ruling is
currently before us. The original district judge
had denied the School District's and Administra-
tors' motion for summary judgment. The new judge,
upon assuming responsibility for the litigation,
proceeded to reconsider the School District's
motion for summary judgment. It was while the
second judge had the motion under reconsideration
that Ms. Vargas-Harrison was terminated.

/2 When conducting Pickering balancing, a court
weighs the following seven factors:

(1) whether the statement would create problems
in maintaining discipline by immediate supervi-
sors or harmony among co-workers; (2) whether the
employment relationship is one in which personal
loyalty and confidence are necessary; (3) whether
the speech impeded the employee's ability to
perform her daily responsibilities; (4) the time,
place, and manner of the speech; (5) the context
in which the underlying dispute arose; (6) wheth-
er the matter was one on which debate was vital
to informed decisionmaking; and (7) whether the
speaker should be regarded as a member of the
general public.

Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir.
1999).

/3 See Warzon v. Drew, 60 F.3d 1234, 1238 (7th Cir.
1995) (collecting cases and secondary authorities
on the relationship of the patronage dismissal
cases to the Pickering balancing test).

/4 Similarly, speech critical of a superior's abuse
of office does not come within the policy-maker
analysis. See Bonds, 207 F.3d at 979.

/5 Because this conclusion disposes of Ms. Vargas-
Harrison's First Amendment claims, we need not
address the Administrators' claim of qualified
immunity.