# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-1205/1217/1218

_____

| | | |
|---|---|---|
| Cathryn E. Hinshaw, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Roger Smith, Individually and as | * | Appeals from the United States |
| State Representative; The Arkansas | * | District Court for the |
| Local Police and Fire Retirement | * | Eastern District of Arkansas. |
| System; Joanne Bush; Mike | * | |
| Gaskill; William Milburn; Charles | * | [PUBLISHED] |
| Lawrence; Donna Marie Adkins; | * | |
| Van B. Alexander; Troy Waters, | * | |
| Individually and as Trustees; Ted | * | |
| Mullinex, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: October 10, 2005
Filed: January 30, 2006

_____

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

The appellants bring these interlocutory appeals from the district court's denial of their claims of qualified and absolute immunity in the civil rights lawsuit filed by

Cathryn Hinshaw following her resignation from employment with The Arkansas Local Police and Fire Retirement System in 2003. We dismiss Ted Mullinex's appeal for lack of appellate jurisdiction. We reverse the district court's denial of summary judgment to the remaining appellants and remand to the district court to enter judgment in favor of the defendants on the claims that are properly before us in these interlocutory proceedings.

I.

The Arkansas Local Police and Fire Retirement System (LOPFI) was created to establish a benefit program and retirement system for police officers and firefighters in Arkansas. Cathryn Hinshaw had been the executive director of LOPFI since its inception in the early 1980s. As executive director, Hinshaw represented LOPFI during the sessions of the Arkansas General Assembly and interacted with legislators. The general administration of LOPFI, a state administrative agency, was vested in its five-member Board of Trustees (Board), to whom Hinshaw reported. Hinshaw made recommendations to the Board, and she appointed the clerical and professional employees of LOPFI, but she was precluded from being involved with the appointment of Board members. The Governor of Arkansas appoints the Board members based on recommendations made by the House and Senate Joint Committee on Public Retirement and Social Security Programs (Joint Committee). See Ark. Code § 24-10-201(a). Defendants Joanne Bush, Mike Gaskill, William Milburn, Charles Lawrence, and Troy Waters (collectively "the individual Board members") were the five Board members at the time of the events relevant to this case.[1]

Roger Smith was an Arkansas state representative and cochaired the Joint Committee. In February 2003, the Joint Committee introduced a bill that would

_____

[1]Donna Marie Adkins and Van B. Alexander were appointed to the Board after Hinshaw's termination. The district court granted them summary judgment, and they are not part of these interlocutory appeals.

increase the number of Trustees on the Board by two, from five to seven. Hinshaw thought that the bill was bad policy because it would create an imbalance on the Board between members from public employee interest groups and public employer interest groups and taxpayer constituents. Nevertheless, the bill passed.

Hinshaw alleged in her civil rights complaint that Representative Smith wanted her job when his legislative term expired and that he conspired with defendant Mullinex, a lobbyist, and members of the Board in early 2003 to have Mr. Smith replace Ms. Hinshaw as executive director. Hinshaw alleged that Smith made false accusations to the Board members about Hinshaw's alleged poor performance in an effort to get her fired, and that these actions violated an Arkansas law that prevents a legislator from using his position to secure special privileges for himself.

Ted Mullinex was a lobbyist who represented the interests of the public employees covered by LOPFI. Hinshaw alleged in her complaint that Mullinex approached Board members in July 2003 seeking a commitment by them to replace Hinshaw with Smith. According to Hinshaw, Smith directed Mullinex to talk to the Board members on his behalf, and she asserted that these communications were in violation of Arkansas law because Mullinex did not disclose in required state lobbyist filings that he was a lobbyist on Smith's behalf.

Hinshaw, an at-will employee, was placed on probation and suspended twice in 2003. In February of 2003, Hinshaw provided erroneous information to a magazine, which published it. When confronted by the Board at its March meeting, Hinshaw denied providing the information. She was placed on a six-month probation in June 2003 based on the Board's investigation of the comments to the magazine, a lack of oversight during the most recent legislative session, failure to respond to legislative phone calls, and other enumerated concerns about her performance. On August 11, 2003, LOPFI suspended Hinshaw without pay for twelve days based on

its determination that she had in fact lied at the March meeting about providing the erroneous information to the magazine.

While on the twelve-day suspension, Hinshaw scheduled a meeting with the Governor's office to discuss the two new Board positions created by the legislation introduced by Representative Smith's Joint Committee. She met with members of the Governor's staff on August 14, but did not indicate to the Governor's staff members that she was suspended at the time. Ms. Hinshaw urged the Governor to postpone naming the new Board members even though the legislation had already passed. After this meeting, the Governor's staff told Representative Smith that according to Hinshaw the LOPFI Board opposed naming the two new Board members. Mr. Smith asked the Board members about their position on the appointments and informed them of Hinshaw's August 14 conversation with the Governor's office. Ms. Hinshaw says she does not recall whether she indicated to the Governor's staff that she was speaking on behalf of LOPFI, but does not dispute the Governor's staff member's statement that she represented herself at the meeting as appearing on behalf of LOPFI and as expressing the Board's views.

On September 4, 2003, Hinshaw received a 30-day suspension without pay. She was reminded that she was prohibited from attempting to influence gubernatorial appointments or supporting or opposing legislation unless directed to do so by the Board. On December 4, 2003, during an executive session of the Board, the LOPFI Board gave Hinshaw the options of either resigning or being terminated. Hinshaw resigned and brought this civil rights lawsuit. Hinshaw brought claims under 42 U.S.C. §§ 1983 and 1985 against LOPFI, the individual Board members, Representative Smith, and lobbyist Mullinex, alleging that she was disciplined and constructively discharged for engaging in protected speech in violation of the First Amendment, the Fifth Amendment, and the Fourteenth Amendment. She also brought several state law claims.

The district court granted summary judgment to the defendants on the § 1985 conspiracy claim, the § 1983 claims premised on the Fifth and Fourteenth Amendment due process violations, and a state law defamation claim. The district court determined that disputes of material fact existed concerning the § 1983 First Amendment claim, as well as the state law wrongful discharge, civil conspiracy, and tortious interference with contract claims, and it denied summary judgment on those claims. The district court also determined that the fact issues surrounding the First Amendment claim prevented it from granting qualified immunity to the individual Board member defendants because the First Amendment and qualified immunity analysis was identical under the Pickering-Connick[2] test. The district court also declined to grant either absolute or qualified immunity to Representative Smith, finding that issues of fact existed concerning whether Mr. Smith was acting in his legislative capacity when he communicated with the Board. Finally, the district court found that fact issues defeated Mullinex's immunity defense under Noerr-Pennington.[3] The defendants bring these interlocutory appeals seeking review of the denial of their claimed immunities.

## II.

### A.    Appellate Jurisdiction

While the denial of a motion for summary judgment is generally unreviewable as an impermissible interlocutory appeal, we have limited authority under the collateral order doctrine to review the denial of a motion for summary judgment to the extent the motion is based on the right to absolute or qualified immunity, which

[2]See Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

[3]See United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).

protects a defendant from having to defend a lawsuit. <u>See</u> <u>Johnson v. Jones</u>, 515 U.S. 304, 311 (1995); <u>Crow v. Montgomery</u>, 403 F.3d 598, 601 (8th Cir. 2005) (qualified immunity); <u>Maitland v. Univ. of Minn.</u>, 260 F.3d 959, 962 (8th Cir. 2001) (legislative immunity). We review "'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.'" <u>Johnson</u>, 515 U.S. at 312 (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528 (1985)). We therefore have jurisdiction over the individual Board members' appeals, as well as Smith's appeal to the extent those appeals challenge the district court's denial of qualified or absolute immunity on legal grounds, but not to the extent they involve questions of evidence sufficiency. <u>See</u> <u>Johnson</u>, 515 U.S. at 313.

We also have pendent jurisdiction over claims that are "inextricably intertwined" with the qualified immunity issue, "that is, [we have jurisdiction] when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." <u>Kincade v. City of Blue Springs, Mo.</u>, 64 F.3d 389, 394 (8th Cir. 1995) (internal marks omitted), <u>cert.</u> <u>denied</u>, 517 U.S. 1166 (1996). This pendent jurisdiction extends to the claims that Hinshaw's speech was not constitutionally protected for First Amendment purposes, as the issues "require application of the same constitutional test, and therefore, the question concerning whether the speech is entitled to constitutional protection is 'coterminous with, or subsumed in' the qualified immunity issue." <u>Id.</u> at 395. We therefore have jurisdiction over the § 1983 claim against LOPFI as an entity (which is not eligible for qualified immunity) and the state law wrongful termination claims to the extent disposition of those claims rests on the legal conclusion of whether Hinshaw's speech was entitled to protection. However, claims not premised on this constitutional issue–such as disputes involving causation or state law claims unrelated to Hinshaw's First Amendment rights–are not properly before the court, and we do not address them. <u>Id.</u>

Mr. Mullinex did not seek summary judgment on the basis of qualified or absolute immunity, as he is not a state actor. <u>See</u> <u>Lawyer v. City of Council Bluffs</u>,

361 F.3d 1099, 1103 (8th Cir. 2004). Rather, his motion for summary judgment was based on application of the Noerr-Pennington doctrine, which is a defense to liability premised on the defendant's actions of exercising his own private rights to free speech and to petition the government. See Acoustic Sys., Inc. v. Wenger Corp., 207 F.3d 287, 294 (5th Cir. 2000). Our sister circuits have explicitly held that Noerr-Pennington immunity protects a defendant from liability but not from suit, and that the denial of the defense is not immediately appealable under the collateral order doctrine. See id. at 295 ("Although the Noerr-Pennington doctrine is frequently referred to as an 'antitrust immunity,' it provides only a defense to liability, not an immunity from suit."); We, Inc. v. City of Philadelphia, 174 F.3d 322, 326-30 (3d Cir. 1999) ("Because we conclude that the Noerr-Pennington doctrine does not confer a right not to stand trial, but rather provides only a defense against liability for certain conduct, we find that an order denying Noerr-Pennington immunity . . . is not an appealable collateral order."). Our court has similarly characterized the Noerr-Pennington doctrine as providing a defense to liability, see Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1080 n.4 (8th Cir. 1999) ("[T]he First Amendment generally immunizes the act of filing a lawsuit from tort liability under the Noerr-Pennington doctrine."); South Dakota v. Kan. City S. Indus., Inc., 880 F.2d 40, 50 (8th Cir. 1989) ("The Noerr-Pennington doctrine has been applied in evaluating whether this particular activity is entitled to protection from liability." (footnote omitted)), cert. denied, 493 U.S. 1023 (1990), but we have never characterized it as immunity from standing trial. We join our sister circuits in holding that the denial of Noerr-Pennington immunity is not immediately appealable under the collateral order doctrine. See also Will v. Hallock, No. 04-1332, slip op. at 7 (U.S. Jan. 18, 2005) (clarifying the narrow limitations of the collateral order doctrine and noting that "it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is 'effectively' unreviewable if review is to be left until later.").

Nor is Mullinex's claim to a <u>Noerr-Pennington</u> defense inextricably intertwined with the claims of qualified or absolute immunity that are properly before us. The Supreme Court held in <u>Swint v. Chambers County Comm'n</u>, 514 U.S. 35, 51 (1995), that a court of appeals has limited pendent appellate jurisdiction, noting "that there was no 'pendent party' appellate jurisdiction" where a co-defendant's claims were not inextricably intertwined with the qualified immunity claim. Mullinex's claim to immunity is based on his own right of free speech and his right to petition the government (in this case the LOPFI board) on behalf of his clients, the employee groups covered by the LOPFI retirement system. The issues raised by that claim are totally unrelated to whether the LOPFI board members were entitled to qualified immunity when they suspended and effectively terminated Hinshaw's employment. Neither are the issues raised by Mullinex's <u>Noerr-Pennington</u> defense "inextricably intertwined" with Representative Smith's claims of legislative or qualified immunity in communicating with the LOPFI board members. We lack jurisdiction to consider Mullinex's appeal, and accordingly, we dismiss the appeal in No. 05-1217.

B.      Qualified Immunity/First Amendment Violation by LOPFI Defendants

"We review 'de novo the denial of a motion for summary judgment based on qualified immunity.'" <u>Wright v. Rolette County</u>, 417 F.3d 879, 884 (8th Cir. 2005) (quoting <u>Vaughn v. Ruoff</u>, 253 F.3d 1124, 1127 (8th Cir. 2001)), <u>petition for cert. filed</u>, 47 U.S.L.W. 3363 (U.S. Dec. 7, 2005) (No. 05-742). At this stage, we construe the facts in the light most favorable to Hinshaw, the nonmoving party, and accept those facts asserted by Hinshaw that are supported by the record. Summary judgment is inappropriate if "there is a genuine dispute concerning predicate facts material to the qualified immunity issue." <u>Id.</u> (internal marks omitted).

Qualified immunity protects public officials from personal liability under § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v.</u>

<u>Fitzgerald</u>, 457 U.S. 800, 818 (1982) (internal marks omitted).  We first address whether the facts alleged show that the state actor's conduct violated a constitutional right.[4]  <u>Davis v. Hall</u>, 375 F.3d 703, 712 (8th Cir. 2004).  If that threshold question is answered in the negative, we need not proceed further, as the defendant is entitled to qualified immunity.  If a constitutional right may have been violated, we proceed to the second step and determine whether the right was clearly established.  <u>Id.</u>

In addressing Hinshaw's First Amendment claim, we first determine whether her speech touched on a matter of public concern.  <u>See</u> <u>Connick</u>, 461 U.S. at 143; <u>Kincade</u>, 64 F.3d at 395.  If it did, then we apply the <u>Pickering</u> balancing test, which requires a "'balanc[ing] between the interests of the employee, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.'" <u>Connick</u>, 461 U.S. at 142 (quoting <u>Pickering</u>, 391 U.S. at 568).  "The inquiry into the protected status of speech is one of law, not fact."  <u>Id.</u> at 148 n.7.  The balancing of the <u>Pickering</u> factors is a legal chore for the court, though fact disputes concerning any of the factors are appropriately submitted to a jury.  <u>See Gordon v. City of Kansas City, Mo.</u>, 241 F.3d 997, 1003 (8th Cir. 2001).

The parties dispute whether Hinshaw was acting in her capacity as a concerned citizen when she spoke with the Governor's staff or whether she was representing the views of the Board and acting within the scope of her employment.  The district court determined that this fact issue precluded summary judgment for the defendants.  Even if Hinshaw was arguably speaking as a citizen on a matter of public concern, we would then apply the <u>Pickering</u> balancing test, which is also a legal issue for the court. As further explained below, the <u>Pickering</u> balancing test favors the LOPFI Board,

---

[4]We may dispose of the pendent claims that depend on a First Amendment violation only if we decide the qualified immunity claim at this first step, because it is the lack of a constitutional violation that would necessarily resolve those pendent claims.

making the fact issue of whether Hinshaw was speaking on a matter of public concern, upon which the district court relied in denying summary judgment, irrelevant to the outcome of this case. We thus presume, for summary judgment purposes, that Hinshaw was speaking on a matter of public concern and proceed to the Pickering balancing test.

"'[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign.'" Altman v. Minn. Dep't of Corr., 251 F.3d 1199, 1202 (8th Cir. 2001) (quoting Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion)). While the government's actions toward its citizenry in general is greatly circumscribed by the individual rights guaranteed by the Constitution, "the [g]overnment, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." Connick, 461 U.S. at 151 (internal marks omitted). That is not to say that government employees relinquish all of their First Amendment protections when they accept public employment. Rather, applying the Pickering test we weigh the employee's right to engage in the particular speech at issue with such considerations as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

The defendants urge us to forego the Pickering balancing test and instead apply the rule established by the Sixth Circuit in Rose v. Stephens, 291 F.3d 917, 922 (6th Cir. 2002), which holds that the Pickering balance favors the government as a matter of law when a policymaking or confidential employee's speech is related to the employee's political or policy views. This view, in effect, represents an extension of Supreme Court precedent as enunciated in Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980). In those cases, the Supreme Court established

that the termination of a government employee based on the employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved. See Branti, 445 U.S. at 517-18. We have recognized that in cases like Elrod and Branti involving pure patronage dismissals, the individual and government interests are essentially fixed, so that there is no need to perform a Pickering balance. See Horton v. Taylor, 767 F.2d 471, 480 (8th Cir. 1985). In effect, the "balancing [has] really already [been] achieved by the very formulation of the [Elrod/Branti] rule." Id. at 480-81 n.10. See also O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 719 (1996) (noting the advantages of avoiding a balancing test in pure partisan cases). Thus, we have held that "[i]f discharge solely because of party affiliation is found, this will involve applying the narrow Branti justification test. If a discharge for overt expressive conduct is found, it will involve application of the Pickering-Givhan-Connick balancing test." Horton, 767 F.2d at 481 (internal marks omitted). The Supreme Court has also indicated that where speech is intermixed with a political affiliation requirement, Pickering balancing is appropriate. See O'Hare Truck Serv., Inc., 518 U.S. at 718-19. See also Barker v. City of Del City, 215 F.3d 1134, 1139 (10th Cir. 2000) (noting that the Supreme Court in O'Hare Truck Service implicitly rejected the position that a "political affiliation" employee can be terminated for her speech without the need to consider the Pickering balancing factors).

The present case does not involve any claims of political affiliation. In Rose, the Sixth Circuit expanded the Elrod/Branti policymaker exception analysis to include a situation where a policymaking employee was terminated for expressive conduct even though political affiliation was not at issue. See 291 F.3d at 921. The Seventh Circuit is in accord with the Sixth Circuit. See Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 973 (7th Cir. 2001) ("[T]he [policymaker] corollary is a shorthand for the Pickering balancing; in certain instances, the government employer's need for political allegiance from its policymaking employee outweighs the

employee's freedom of expression to such a degree that the fact-specific Pickering inquiry is not required." (internal marks omitted)), cert. denied, 537 U.S. 826 (2002). Cf. Biggs v. Best, Best, & Krieger, 189 F.3d 989, 994-95 (9th Cir. 1999) (noting that "an employee's status as a policymaker or confidential employee would be dispositive of any First Amendment retaliation claim" in a case involving both speech and political affiliation). Other courts continue to apply the Pickering balancing test when a policymaking or confidential employee is terminated based on speech rather than political affiliation, while recognizing that the significance of the employee's status as a policymaker weighs heavily in the government's favor in applying the Pickering balance. See McEvoy v. Spencer, 124 F.3d 92, 101, 102-03 (2d Cir. 1997) (rejecting Elrod and applying a modified Pickering test, which gives significant but not dispositive weight to the policymaking status of the employee, when a policymaking employee is discharged solely for speaking out on matters of public concern and political affiliation is not involved in the decision); see also Curinga v. City of Clairton, 357 F.3d 305, 314 (3d Cir. 2004) ("Although the result is likely to be the same under Elrod and Pickering, when an employee's speech is intermixed with political affiliation, the Pickering balancing standard is the better analysis to apply."); Flynn v. City of Boston, 140 F.3d 42, 46-47 (1st Cir.) (establishing "a reasonable working rule that, where the employee is subject to discharge for political reasons under the Elrod and Branti cases, a superior may also–without offending the First Amendment's free speech guarantee–consider the official's substantive views" in applying the Pickering balance), cert. denied, 525 U.S. 961 (1998).

We hesitate to expand the Elrod-Branti exception to a case where party affiliation is not alleged as a basis for the termination. Accordingly, we decline to follow all aspects of Rose in this case.[5] We do recognize the necessarily adverse

_____

[5]Although we cited Rose with approval in Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005), the issue of the application of the Elrod-Branti policymaker exception to the Pickering balancing test was not directly at issue in Bradford. Bradford's citation to the Sixth Circuit's opinion in Rose provides no basis

effect an employee's speech on a matter related to the employee's policymaking or confidential duties would have on the factors enumerated in the <u>Pickering</u> balancing test, however, and we agree with those circuits that conclude that the employee's status as a policymaking or confidential employee weighs heavily on the government's side of the <u>Pickering</u> scale when the speech concerns the employee's political or substantive policy views related to her public office.

We turn then to the <u>Pickering</u> balancing test. Hinshaw was no doubt a policymaking employee as that term is used in the context of First Amendment protection for government employees. As executive director, Hinshaw made administrative recommendations to the Board, gave the Board her opinion on whether proposed legislation conflicted with other laws, considered whether proposed legislation would achieve the Board's objectives, conveyed the covered members' interests to the Board, and served as the liaison between the Board and members of the legislature. (Smith App. at 183-99.) Hinshaw contacted legislators regarding the LOPFI legislative package each legislative session and presented the Board's views to the legislature. (<u>Id.</u> at 300, 576-77.) She talked to the Governor's office about various bills, answering their questions about the intent of the bill and the costs of the bill. She represented LOPFI and the Board's interests during her discussions with legislators and the Governor's office when she communicated to them about bills relevant to LOPFI. (<u>Id.</u> at 577-78.) Hinshaw recognized herself that it was important for the Board to have confidence in her as the executive director in order for her to effectively perform her duties. (<u>Id.</u> at 183.)

The speech for which Hinshaw was disciplined clearly related to her substantive policy views and her position as executive director of LOPFI. Hinshaw believed that the new legislation was bad policy because it skewed the balance of the Board toward the covered members of the system and against the cities (and ultimately the

---

to deviate from our prior precedent established in <u>Horton</u>, as discussed <u>supra</u>.

taxpayers) who funded the system. (Id. at 207.) Hinshaw was disciplined for her misrepresentations to the Governor's office about the Board's view of the newly-enacted legislation and her suggestion that the Governor not follow the new law. Regardless of whether Hinshaw conveyed to the Governor's office that she was giving her own opinion, the Governor's office was undisputably left with the impression that the Board, not just Hinshaw, wanted the Governor to ignore the law. Hinshaw communicated with the Governor's office despite prior directives to refrain from lobbying for or against pension legislation without the prior knowledge and concurrence of the Board chairman and to avoid involvement with Board appointments. (Id. at 254.)

These factors overwhelmingly outweigh whatever interest Hinshaw may have had in communicating her own personal views of the legislation as a citizen to the Governor's office. As relevant as the legislation was to the taxpayers of Arkansas who ultimately help fund the retirement systems, Hinshaw's interest as a private citizen did not give her *carte blanche* to ignore her employer's directives and miscommunicate the Board's views of the legislation to the Governor's office. The LOPFI Board has a legitimate expectation that its executive director will not undermine the Board's efforts by misrepresenting its position on matters related to the Board. "[I]t is insubordination for an employee whose position requires loyalty to speak on job-related issues in a manner contrary to the position of [her] employer." Rose, 291 F.3d at 923. Even more so, it is insubordination to misrepresent the employer's position as being consistent with the employee's personal opinion. "[A]s the Supreme Court has recognized, 'employees may always be discharged for good cause, such as insubordination . . . .'" Id. (quoting Elrod, 427 U.S. at 366). Employee acts of insubordination can tip the balancing process in favor of the employer. See Barnard v. Jackson County, Mo., 43 F.3d 1218, 1224 (8th Cir.), cert. denied, 516 U.S. 808 (1995).

The Board's interests as Hinshaw's employer clearly outweighed Hinshaw's interests in speaking out as a private citizen, and Hinshaw's speech was not protected by the First Amendment. The district court erred in finding that a fact dispute prevented summary judgment. Because there was no First Amendment violation, the individual Board member defendants are entitled to qualified immunity, and LOPFI is entitled to summary judgment on the § 1983 claim against it premised on the First Amendment.

Hinshaw's counsel clarified during oral argument that Hinshaw's state law wrongful discharge claim was premised on the alleged violation of her First Amendment rights. The district court declined to grant summary judgment on the state law claim because it found that a fact dispute remained concerning whether Hinshaw was properly exercising her First Amendment rights. Our determination that there was no First Amendment violation removes the district court's basis for denying summary judgment on Hinshaw's state law wrongful discharge claim. Accordingly, summary judgment should have been granted on this claim in favor of the LOPFI defendants as well.[6] The district court's judgment denying summary judgment to the individual Board members and to LOPFI on Hinshaw's § 1983 claim and state law wrongful discharge claim is reversed.

C.     Legislative and Qualified Immunity to Representative Smith

The allegations against Mr. Smith include that he reported Hinshaw's meeting with the Governor's office to the Board, allegedly falsely reported to the Board that Hinshaw did not return legislators' phone calls, pushed through a bill without following state procedure, and pressured the Board members to give Hinshaw's job to him. Smith admits that pressuring Board members for Hinshaw's job is not related

---

[6]Hinshaw's remaining claim against LOPFI and the individual Board members is a state law civil conspiracy claim that is not part of this appeal.

to his legislative position, and he is not seeking legislative immunity regarding those allegations. (Smith Br. at 16; Smith Reply Br. at 3-4, 8.) We limit our discussion of absolute immunity to the remaining three allegations.

Absolute legislative immunity protects legislators from suit for actions taken in furtherance of legitimate legislative activity. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998). Introducing a bill is "quintessentially legislative," id. at 55 (holding that voting on an ordinance is protected by legislative immunity), and any actions taken by Mr. Smith related to the February 2003 bill are protected by legislative immunity. In addition, as cochairman of the Joint Committee, Smith was responsible for submitting names to the Governor to fill the vacant Board positions. His discussion with the Board members about Hinshaw's representations to the Governor's office that the Board did not want the newly-created positions filled falls within his legislative duties. Finally, we find that Smith's communications with the Board about Hinshaw's responsiveness to legislators in general, regardless of his motive for making the communications, similarly fall within the realm of Smith's duties as a legislator. Smith is protected by absolute legislative immunity for the allegations concerning these events.

Ms. Hinshaw's argument focuses on Mr. Smith's actions of pressuring Board members to give him Hinshaw's job, which we assess against Smith's claim to qualified immunity. The district court applied the Pickering balancing test to Hinshaw's § 1983 claim against Smith, discussing the test in terms of a public employer terminating an employee. However, Smith was not Hinshaw's employer and had no decision-making authority over Hinshaw. At most, Hinshaw claims that Smith pressured the Board to fire her so that he could have her position. The Pickering balancing test is not apposite to this situation. See X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 70 (2d Cir. 1999) ("[C]ases holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims

against persons who are not decisionmakers but merely advocates."); Burnham v. Ianni, 119 F.3d 668, 678 (8th Cir. 1997) (en banc) (noting that the Pickering balancing test does not apply outside of the context of an employee discipline case).

The Second Circuit case of X-Men is directly on point, and we adopt its reasoning. X-Men involved two legislators who publicly criticized the state's employment of a security firm, X-Men, whose employees were affiliated with the Nation of Islam, and the legislators pressured the state not to renew the contract. X-Men claimed that the nonrenewal of its contract violated its right to freedom of association and freedom of religion. The court held that the legislators, who were not the decisionmakers, were entitled to qualified immunity because there was no clearly established federal right for an individual "to prevent legislators from exercising their rights merely to express their views." X-Men Sec., 196 F.3d at 70.

While persons in a similar position who augment their advocacy with threats or coercion might be vulnerable to liability, "speech by persons who are not decisionmakers and who merely engage in advocacy without threats, intimidation, or coercion is protected by the First Amendment. The 'critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not.'" Id. at 70-71 (quoting Healy v. James, 408 U.S. 169, 192 (1972)). Smith's pressure on the Board members falls within this protection. There are no allegations that Smith threatened or coerced any of the Board members. At most, he may have pressured them verbally, but his advocacy for Hinshaw's position never moved beyond the realm of speech. See id. at 71 ("While the complaint alleges that the legislators exerted 'pressure' on the decisionmakers, there is no allegation that such 'pressure' took the form of anything other than speech."). There is no First Amendment right to prevent legislators from expressing their own views, as long as they do so without engaging in any threat or coercion. Id. at 70.

As in X-Men, the district court here relied solely on employment cases. The proper focus should be on whether an objective person in Smith's shoes would have known that he violated Hinshaw's clearly established right to free speech when he sought her job. Whether or not Smith violated state law when he sought Hinshaw's job does not establish a violation of Hinshaw's constitutional right to free speech. Based on the reasoning of X-Men, Smith is entitled to qualified immunity on Hinshaw's § 1983 claim that Smith violated her First Amendment rights by seeking her job because she has failed to state a claim for a violation of her constitutional rights.

The district court denied summary judgment to Smith on Hinshaw's state law claims of wrongful termination, civil conspiracy, and tortious interference with contract based on the existence of material fact disputes. As noted above, Hinshaw's counsel confirmed that the wrongful termination claim was premised on the First Amendment claim. As such, the wrongful termination claim is inextricably intertwined with our qualified immunity holding that Smith did not violate Hinshaw's First Amendment rights, and accordingly, the district court's denial of summary judgment on that claim is reversed. We do not address the remaining state law claims in this interlocutory appeal. See Kincade, 64 F.3d at 395.

## III. Conclusion

The district court's judgment in Appeal No. 05-1205, denying the motion for summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against LOPFI, Bush, Gaskill, Milburn, Lawrence, and Waters, is reversed and remanded for the entry of an order dismissing those claims against those defendants. The district court's judgment in Appeal No. 05-1218, denying summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against Representative Smith, is likewise reversed and remanded to the district court for the entry of an order dismissing those claims against defendant Smith. Appeal No. 05-1217, involving the

district court's denial of <u>Noerr-Pennigton</u> immunity to Mullinex, is dismissed for lack of interlocutory appellate jurisdiction.

We recognize that our disposition leaves this case in an odd posture, leaving Mr. Mullinex, the lobbyist, alone to face Hinshaw's remaining federal § 1983 claim. Our limited appellate jurisdiction over interlocutory appeals dictates this conclusion. It does not prevent any of the parties from seeking further summary dispositions in the district court concerning any of the remaining claims over which we did not exercise interlocutory appellate jurisdiction.

_____