# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1643

_____

Gary Thompson; Dalton Elliott; Gary Scott Manning; Alicia Hardy

*Plaintiffs - Appellants*

v.

Andy Shock, Individually and in his Official Capacity as Faulkner County Sheriff

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: December 15, 2016
Filed: March 28, 2017

_____

Before WOLLMAN and SMITH,[1] Circuit Judges, and WRIGHT,[2] District Judge.

_____

SMITH, Circuit Judge.

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

[2]The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota, sitting by designation.

Gary Thompson, a former transport deputy in Faulkner County, Arkansas, sued Sheriff Andy Shock, in his individual and official capacities, for unlawful employment termination under state and federal law. He brought his federal claim pursuant to 42 U.S.C. § 1983 for the deprivation of his First Amendment right of free association. The district court dismissed the federal claim, granting Sheriff Shock qualified immunity in his individual capacity and holding that Sheriff Shock in his official capacity was not a policymaker for purposes of Faulkner County's liability. The district court then declined supplemental jurisdiction over the remaining state-law claims. Thompson appeals, seeking reinstatement of his claims against Sheriff Shock. Upon review, we affirm the district court's dismissal of Thompson's claim against Sheriff Shock in his official capacity, but we vacate the finding of qualified immunity for Sheriff Shock in his individual capacity and remand that issue for analysis under a different line of precedent.

## I. *Background*

In 2012, while employed as a deputy in the Faulkner County Sheriff's Office, Andy Shock ran for Sheriff. One of Shock's coworkers in the office, Gary Thompson, did not support his candidacy. Thompson publicly endorsed Shock's main rival, Tommy Earnhart. While off-duty, Thompson campaigned for Earnhart by attending fundraisers, placing campaign signs in his yard, and wearing a campaign T-shirt. This campaigning did not interfere with Thompson's work activities, nor does the record reflect that Thompson made any public statements regarding the Sheriff's Office or other issues of public concern. After Shock discovered that Thompson supported his rival, the two met privately; Thompson assured Shock that he supported Earnhart as a personal friend and that he would be willing to work for Shock if he won the election. Thompson alleges that Shock told others that, as Sheriff, Shock would terminate current office employees that did not support his candidacy.

In November 2012, after Shock won the election, Thompson received a letter from newly elected Sheriff Shock notifying him of his "non-selection" for

employment in January 2013. The letter outlined a grievance procedure providing Thompson a predeprivation hearing to contest his termination. Thompson requested the hearing, and during the proceedings, Sheriff Shock testified that he chose not to select Thompson because of his "lack of good work ethic." The record reflects no discipline procedures or negative performance evaluations regarding Thompson before he received this letter of non-selection.

Thompson and three other non-selected employees brought this suit in 2013, alleging violations of their rights under the Arkansas Political Freedom Act, the Arkansas Constitution, and the First Amendment of the United States Constitution. The district court granted summary judgment for Shock in his individual and official capacities. The district court analyzed the First Amendment claim under the formula set out in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). The district court determined that Thompson's claimed First Amendment right was not clearly established under the *Pickering–Connick* test, granted qualified immunity to Sheriff Shock in his individual capacity, and dismissed without prejudice the related state-law claims. The district court also dismissed Thompson's claims against Shock in his official capacity because Thompson failed to prove that Sheriff Shock was deliberately indifferent to his constitutional rights. Thompson moved to alter or amend the judgment, but the district court denied the motion. The court did, however, revise its reasoning on the official-capacity claim. The court shifted the basis for its decision to Sheriff Shock's lack of final policymaking authority in employment matters. Thompson appeals.

## II. *Discussion*

"We review grants of summary judgment de novo." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1207 (8th Cir. 2013). In a § 1983 action, we will reverse an award of summary judgment in favor of a public official in his individual capacity only if a reasonable jury could find his actions under the color of state law "violated 'a right secured by the Constitution and laws of the United States.'" *Id.*

(quoting *Cook v. City of Bella Villa*, 582 F.3d 840, 848 (8th Cir. 2009)). We will reverse an award of summary judgment in favor of a public official acting in his official capacity only if a reasonable jury could find that the constitutional violation was committed "pursuant to official municipal policy of some nature." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thompson appeals the grant of summary judgment to Sheriff Shock in both capacities.

## A. *Qualified Immunity*

Qualified immunity shields a government official acting in his individual capacity from liability "unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Federal courts conduct a two-step inquiry into the application of qualified immunity: "(1) whether the facts alleged demonstrate a violation of the employee's constitutional right and (2) whether that right was clearly established at the time of the employee's firing." *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832 (8th Cir. 2015). Qualified immunity protects the reasonable decisions of government actors except in cases of plain incompetence or knowing violation of the law. *New*, 787 F.3d at 900.

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick*, 461 U.S. at 140. Nevertheless, "the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.* (quoting *Pickering*, 391 U.S. at 568). "A State may not condition public employment on an employee's

-4-

exercise of his or her First Amendment rights." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996). "Absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression." *Id.* "With a few exceptions, the Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1417 (2016).

The Supreme Court has developed two lines of cases that assess how to balance the First Amendment rights of government employees with the need of government employers to operate efficiently. *See Hinshaw v. Smith*, 436 F.3d 997, 1005–06 (8th Cir. 2006). For "overt expressive conduct," federal courts apply the balancing test as found in the line of cases following *Pickering* and *Connick*. *Id.* at 1005. The typical *Pickering–Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job. *See Anzaldua*, 793 F.3d at 835–36 (analyzing under *Pickering–Connick* the termination of a Fire District employee after the employee emailed a local reporter about department conditions). This test includes various interrelated factors:

> (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Id.* at 835. The *Pickering–Connick* test provides flexible weighing of the case-specific facts to balance the interests of the government with those of the employee.

For "pure patronage dismissals," federal courts apply the narrow-justification test outlined in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980). *Hinshaw*, 436 F.3d at 1005. The typical *Elrod–Branti* case involves the dismissal of an employee because of his or her political affiliations or support for certain candidates. *See DePriest v. Milligan*, 823 F.3d 1179, 1184 (8th Cir. 2016) (analyzing under *Elrod–Branti* the dismissal of the Chief Deputy after the election of the new Circuit Clerk). "[A] dismissal solely on account of an employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* (internal quotation marks omitted) (quoting *Langley v. Hot Spring Cty.*, 393 F.3d 814, 817 (8th Cir. 2005)). Under *Elrod–Branti*, the court cabins its inquiry to the political-affiliation requirement itself, without the need to do the *Pickering–Connick* balancing analysis. *O'Hare Truck Serv., Inc.*, 518 U.S. at 719; *Hinshaw*, 436 F.3d at 1005 ("We have recognized that in cases like *Elrod* and *Branti* involving pure patronage dismissals, the individual and government interests are essentially fixed, so that there is no need to perform a *Pickering* balance.").

In addition, many cases present an "intermixed" scenario in which a policymaking employee receives an adverse employment action based on "specific instances of the employee's speech or expression." *O'Hare Truck Serv., Inc.*, 518 U.S. at 719. In *Hinshaw*, we applied the *Pickering–Connick* test to the case of an executive director of a state agency who alleged termination in violation of her First Amendment rights. 436 F.3d at 1006–07. Hinshaw, a policymaking employee, spoke out against the policies promulgated by the agency's Board of Trustees, and she was later disciplined. *Id.* at 1007. We stated that despite Hinshaw's First Amendment rights as a private citizen, her position as a policymaking employee "did not give her *carte blanche* to ignore her employer's directives and miscommunicate the Board's views." *Id.* We determined that the factors in the Board's favor "outweigh[ed] whatever interest Hinshaw may have had in communicating her own personal views," noting that the Board had a "legitimate expectation that its executive director [would]

-6-

not undermine the Board's efforts." *Id.* Thus, "where speech is intermixed with a political affiliation requirement, *Pickering* balancing is appropriate." *Id.* at 1006.

To summarize, if an employee is discharged because of his or her expressive conduct, we apply the *Pickering–Connick* test. *Id.* at 1005. If an employee is discharged because of his or her political affiliation, we apply the *Elrod–Branti* test. *Id.* And when a political-affiliation employee gets discharged for his or her expressive conduct, we apply *Pickering–Connick*. *Id.* at 1006.

In granting qualified immunity to Sheriff Shock, the district court relied on *Nord v. Walsh County*, 757 F.3d 734 (8th Cir. 2014). Nord, a deputy sheriff in Walsh County who ran for sheriff, was terminated the day after he lost the election. *Id.* at 738. As a candidate, Nord made multiple public statements regarding the current sheriff's health, his wife, and his future political aspirations. *Id.* at 742. He sued the re-elected sheriff alleging that "he was fired in retaliation for the statements he made along the campaign trail." *Id.* at 738. Because this presented an "intermixed case" including both public statements and political affiliation, we declined to apply *Elrod–Branti* and instead applied *Pickering–Connick* to determine whether the employer was justified in terminating Nord. *Id.* at 744. Thompson's case presents a different scenario. Unlike Nord, Thompson made no public statements regarding the Sheriff's Office; he simply supported an opposing candidate. "In such cases, the hiring authority must demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved. . . . This circuit has held that '[i]f discharge solely because of party affiliation is found, this will involve applying the narrow [*Elrod–Branti*] justification test . . . .'" *Id.* (first alteration in original) (quoting *Hinshaw*, 436 F.3d at 1005).

For Thompson's case, we choose to follow *Heffernan v. City of Paterson*—a recent Supreme Court decision published after the district court filed its judgment—to determine the best analytical framework. 136 S. Ct. 1412. Heffernan, a city police

-7-

officer, retrieved a campaign sign on behalf of his mother, and the police department fired him for "overt involvement" in the campaign. *Id.* at 1416. Using the *Elrod–Branti* analysis, the Supreme Court determined that a government employer could violate an employee's First Amendment rights even if acting under the mistaken belief that the employee is affiliated with a certain candidate.[3] *Id.* at 1419. Thompson, like Heffernan, suffered an adverse employment decision not because of his overt expressive conduct but because of his affiliation with the "wrong" candidate. When the constitutional right at issue involves "joining, working for or contributing to the political party and candidates of [the employee's] choice," we apply the *Elrod–Branti* test. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69 (1990). Accordingly, because the district court applied a different test, we remand the question of qualified immunity to the district court for analysis under *Elrod–Branti*. *See Fink v. Union Cent. Life Ins. Co.*, 65 F.3d 722, 724 (8th Cir. 1995) (remanding the issue of excusable neglect to the district court after Supreme Court precedent altered the analytical framework).

B. *Municipality Liability*

Under § 1983, a municipality cannot be held liable for the tortious conduct of an employee, unless the employee acts pursuant to a municipality's "official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

> The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. . . .

[3]The Supreme Court declined to express views on the possibility that the plaintiff's employers terminated him because of a neutral police policy that prohibited overt campaign involvement. *Heffernan*, 136 S. Ct. at 1419. This is not at issue in this case because Arkansas law prohibits the deprivation of a government employee's right "to express his or her opinion as a citizen on political subjects." Ark. Code Ann. § 21-1-207.

[A] municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Id.* at 479–80. To analyze whether a single decision of a government official constitutes an official policy, we look to state law to determine whether the government official possesses "final policymaking authority in the area in which the challenged conduct occurred." *Williams v. Butler*, 863 F.2d 1398, 1401 (8th Cir. 1988). "[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." *Pembaur*, 475 U.S. at 483 n.12. If a county's employment policy is set by a different municipal body, "only that body's decisions would provide a basis for county liability." *Id.* To determine whether a government official serves as the final policymaker, we consult two sources: "(1) 'state and local positive law' and (2) state and local '"custom or usage" having the force of law.'" *Atkinson*, 709 F.3d at 1215 (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Because Thompson complains only of a single action and not the customs of Faulkner County, we will analyze only the policymaking authority granted under positive law.

Thompson argues that as a matter of positive Arkansas law, Sheriff Shock possessed the final policymaking authority in matters of employment for the Sheriff's Office. He relies on the Arkansas Constitution and the Arkansas Code, which generically give the county judge power to hire employees "except those persons employed by other elected officials of the county." Ark. Const. amend. 55, § 3; Ark. Code. Ann. § 14-14-1101(a)(6). This exception, Thompson argues, places final employment policymaking authority in elected officials for their respective offices. *See* Ark. Code Ann. § 14-14-1102(b)(5)(B)(ii)(b) ("The jurisdiction to purchase the labor of an individual for salary or wages employed by other elected officials of the

-9-

county shall be vested in each respective elected official."). Thompson's argument, however, ignores the statutory power of the quorum court to review employment decisions of county employers:

> [A] quorum court may exercise any legislative authority with regard to employee policy and practices of a general nature, including, but not limited to, establishment of general vacation and sick leave policies, general office hour policies, general policies with reference to nepotism, or general policies to be applicable in the hiring of county employees. Legislation promulgated by a quorum court dealing with matters of employee policy and practices shall be applicable only to employees of the county and shall not apply to the elected county officers of the county. Legislation applying to employee policy practices shall be only of a general nature and shall be uniform in application to all employees of the county.

Ark. Code Ann. § 14-14-805(2). By Arkansas statute, the quorum court may be invested with the ability to exercise final authority regarding "general policies to be applicable in the hiring of county employees." *Id.* As the district court noted and as the facts show, Faulkner County provided a grievance procedure through the quorum court to address unconstitutional employment decisions made by the County Sheriff. In fact, Thompson used this procedure to have his employment decision reviewed. Faulkner County's retention of "the right of review" through its grievance procedure is inconsistent with "an absolute delegation of authority" by the County to its Sheriff. *See Williams*, 863 F.2d at 1402. An incomplete delegation of authority "will not result in municipal liability." *Id.*

Thompson also asserts that Sheriff Shock's position as a final policymaker has been settled by the Arkansas Supreme Court. He relies on *Crawford County v. Jones*, which states: "[I]t is patently unreasonable to hold that a county official, such as the assessor, when acting in her capacity as an elected official, could not create liability for the county by her actions." 232 S.W.3d 433, 440 (Ark. 2006). *Crawford County*,

-10-

however, does not support Thompson's assertion. First, the *Crawford County* opinion addresses a state-law breach-of-contract action rather than a federal § 1983 action. *Id.* Second, the facts of *Crawford County* actually support the absence of final policymaking authority for the County Sheriff. The Crawford County Quorum Court, sitting as a grievance committee, ordered the plaintiff to be reinstated after a wrongful discharge, but the county assessor refused to do so. *Id.* at 435–37. In reviewing a jury verdict in favor of the plaintiff, the Arkansas Supreme Court found substantial evidence to support a violation of "the policy adopted by the County." *Id.* at 439. The court then imputed the violation of the assessor to the county, not because the assessor acted as a final policymaker, but because the assessor acted as an agent of the county's final policymaker. *Id.* at 439–40. The Arkansas Supreme Court did not find that the county assessor was the final policymaker for employment purposes, *id.* at 440, and similarly, we do not hold Sheriff Shock to be the final policymaker in this case.

Our review of Arkansas law and the policies promulgated by Faulkner County reveal that Sheriff Shock did not act as a final policymaker in the employment decisions of the Faulkner County Sheriff's Office because employment decisions made by Sheriff Shock were subject to review by the quorum court. We therefore affirm the district court's grant of summary judgment to Sheriff Shock in his official capacity.

### III. *Conclusion*

We vacate the district court's grant of summary judgment in favor of Sheriff Shock in his individual capacity and remand the issue of qualified immunity to be addressed applying the analysis in the *Elrod–Branti* line of cases. We affirm the district court's grant of summary judgment in favor of Sheriff Shock in his official capacity.

———————————————