# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 19-1213

———————————————

Robert A. Curtis

*Plaintiff - Appellee*

v.

Christian County, Missouri; Brad Cole, Christian County, Missouri Sheriff, in his Individual and Official Capacities

*Defendants - Appellants*

Ray Weter; Hosea Bilyeu; Ralph Phillips

*Defendants*

———————————————

No. 19-1214

———————————————

Frank Timothy Bruce

*Plaintiff - Appellee*

v.

Brad Cole, Christian County, Missouri Sheriff, in his Individual and Official Capacities; Christian County, Missouri

*Defendants - Appellants*

Ray Weter; Hosea Bilyeu; Ralph Phillips

*Defendant*s

_____

Appeals from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 12, 2020
Filed: June 26, 2020

_____

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

Sheriff Brad Cole of the Christian County Sheriff's Office ("Sheriff's Office") appeals from the district court's denial of qualified immunity on First Amendment wrongful-discharge claims brought by former Deputy Sheriffs Timothy Bruce and Robert Curtis. Bruce's and Curtis's complaints alleged that Cole, the newly elected sheriff, discharged them for political reasons in violation of their First Amendment rights. Cole argues that political loyalty is an appropriate requirement under Missouri law; therefore, he did not violate Bruce's and Curtis's constitutional rights in discharging them. We agree. Accordingly, we reverse the district court's denial of qualified immunity and remand for further proceedings consistent with this opinion.

I. *Background*

The Christian County Commission scheduled a special election on August 4, 2015, to elect a new sheriff after Sheriff Joey Kyle resigned from office after pleading guilty to violating federal law. Four candidates ran for sheriff in the general election, including Brad Cole (Republican candidate) and Keith Mills (independent candidate).

Mills was the only candidate who was employed by the Sheriff's Office. Between Kyle's resignation and the election, Dwight McNiel served as the interim sheriff.

As the only internal candidate, Mills had the support of many of the Sheriff's Office's employees. Deputy Sheriff Robert Curtis publically endorsed Mills. In support of Mills, Curtis talked to people, knocked on doors, handed out literature, posted on Facebook, and put up a yard sign at his residence.

Like Curtis, Deputy Sheriff Tim Bruce also publically supported Mills for sheriff. In support of Mills, Bruce posted on Facebook, told friends and family to vote for Mills, and loaned Mills a flatbed trailer for Mills to use in a public parade. Bruce also told three or four people in the Sheriff's Office that "[i]f you elect Brad Cole[,] you're trading one crook for another." Pl.'s Sugg. in Opp'n to Defs.' Mot. for Summ. J. at 19, ¶ 61, *Bruce v. Cole*, No. 6:17-cv-03073-SRB (W.D. Mo. Dec. 21, 2018), ECF No. 174. Bruce and Cole did not get along. Bruce "never made any bones about [his] feelings for Brad Cole." *Id.* at 35, ¶ 93 (alteration in original).

One week before the election, McNiel told Bruce that he "need[ed] to be on the right side to keep [his] job and the right side is Brad Cole." *Id.* at 17, ¶ 55. One of McNiel's interim command staff members, Steve Haefling, made "similar comments 2 or 3 times about supporting the right candidate for 2 to 3 weeks before the election." *Id.* at 56, ¶ 180. And, prior to the election, Cole would come to the Sheriff's Office and meet with the interim staff, after which "the interim staff would state that the deputies had a one in four chance of keeping their jobs." *Id.* at 56, ¶ 178.

Cole won the election on August 4, 2015. On August 5, 2015, Bruce called Cole to discuss his employment. Bruce was concerned about his job based on what McNiel and Haefling had told him. Bruce told Cole that he had supported his

opponent, Mills. He also asked Cole about the rumor that Cole was going to fire employees who had supported Mills. Cole replied that he would not fire Bruce.

On August 7, 2015, Cole assumed the duties of sheriff and terminated both Curtis and Bruce. At that time, Curtis was a sergeant supervising the Sheriff's Office's information technology department, and Bruce worked as a detective. Cole knew both Curtis and Bruce had supported Mills at the time that he fired them. Both Curtis and Bruce had been promoted to their respective positions of sergeant and detective by Cole's predecessor just months prior to their termination.

Missouri law provides that "[a]ny full-time deputy sheriff upon dismissal shall be furnished with a written notice of the grounds for the dismissal." Mo. Rev. Stat. § 57.275.1. Cole did not provide written notice for the dismissal of Bruce and Curtis or give them an opportunity to request a hearing. *See id*. The Sheriff's Office also had written policies concerning the discipline and termination of employees. Cole testified he did not read or apply the discipline policy when terminating Bruce and Curtis.

Curtis and Bruce brought separate lawsuits under 42 U.S.C. § 1983, alleging that Cole and Christian County wrongfully discharged them in violation of their First Amendment rights. The district court consolidated the two cases.[1] Cole and Christian County moved for summary judgment against Curtis and Bruce. The district court denied their motions, denying qualified immunity to Cole. Applying the *Elrod-Branti* test,[2] the court concluded that a genuine issue of material fact existed as to whether Cole terminated Curtis and Bruce because of their political activity.

---

[1]Along with these two cases, the district court also consolidated a third case involving Deputy Gary Klossing. Klossing's case is not a part of this appeal.

[2]*See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).

## II. *Discussion*

On appeal, Cole and Christian County argue that the district court erred in denying Cole qualified immunity on Curtis's and Bruce's wrongful-discharge claims. According to Cole and Christian County, under the *Elrod-Branti* test, Curtis and Bruce did not have a constitutional right to support Cole's opponent and become Cole's deputies. Cole and Christian County assert that "[p]olitical loyalty to the sheriff is an appropriate requirement of a Missouri sheriff['s] deputy because a Missouri deputy possesses all the power and duties of the sheriff, is the agent of the sheriff, and the sheriff is liable for his deputies' actions." Appellants' Br. at 13. Christian County argues that it is entitled to summary judgment on the municipal claims against it because Cole did not violate the constitutional rights of Curtis and Bruce.

### A. *Qualified Immunity*

"We review a denial of summary judgment on the grounds of qualified immunity de novo." *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014). This court has "limited jurisdiction to hear an interlocutory appeal of a district court's denial of qualified immunity." *Id.* When the interlocutory appeal "turns on an issue of law," we have jurisdiction to review the district court's order denying qualified immunity. *Id.* We lack jurisdiction, however, "if the pretrial record sets forth genuine issues of fact necessary for resolution of the interlocutory appeal." *Id.*

In reviewing the district court's denial of qualified immunity, we ask "(1) whether the facts taken in the light most favorable to [the plaintiffs] make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the alleged violation." *Thompson v. City of Monticello*, 894 F.3d 993, 998 (8th Cir. 2018) (internal quotation omitted). "Our review is thus limited to determining whether all of the conduct that the district court deemed sufficiently

supported for purposes of summary judgment violated the plaintiff[s'] clearly established federal rights." *Id.* at 997–98 (internal quotation omitted).

Bruce and Curtis allege that Cole wrongfully terminated them in violation of their First Amendment rights. "A State may not condition public employment on an employee's exercise of his or her First Amendment rights." *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017) (quoting *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996)). In fact, a "government may not make public employment subject to the express condition of political beliefs or prescribed expression" in the absence of "some reasonably appropriate requirement." *Id.* (quoting *O'Hare Truck Serv., Inc.*, 518 U.S. at 717). "With a few exceptions, the Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Id.* (quoting *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1417 (2016)).

Two distinct lines of cases exist on "how to balance the First Amendment rights of government employees with the need of government employers to operate efficiently." *Id.* We apply "the balancing test as found in the line of cases following *Pickering* and *Connick*"[3] when "overt expressive conduct" is at issue. *Thompson*, 852 F.3d at 791 (internal quotation omitted). "The typical *Pickering-Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job." *Id.* This "test provides flexible weighing of the case-specific facts to balance the interests of the government with those of the employee." *Id.*[4]

---

[3]*See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

[4]The *Pickering-Connick* test considers the following interrelated factors:

We apply the narrow-justification *Elrod-Branti* test to "pure patronage dismissals." *Id.* (internal quotation omitted); *see also id.* at 792 ("If an employee is discharged because of his or her political affiliation, we apply the *Elrod-Branti* test."). "The typical *Elrod-Branti* case involves the dismissal of an employee because of his or her political affiliations or support for certain candidates." *Id.* at 791. A government employer who dismisses an employee "solely on account of [the] employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* (internal quotation omitted). "Under *Elrod-Branti*, the court cabins its inquiry to the political-affiliation requirement itself, without the need to do the *Pickering-Connick* balancing analysis." *Id.* at 792. "Like many circuits, we have extended the *Elrod-Branti* principle to include cases in which political affiliation was *a* motivating factor in the dismissal, rather than the sole factor." *Langley v. Hot Springs Cty.*, 393 F.3d 814, 817 (8th Cir. 2005).

Some cases, however, may present an "'intermixed' scenario in which a policymaking employee receives an adverse employment action based on 'specific instances of the employee's speech or expression.'" *Thompson*, 852 F.3d at 792 (quoting *O'Hare Truck Serv., Inc.*, 518 U.S. at 719). "[W]hen a political-affiliation

> (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Id.* (quoting *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 835 (8th Cir. 2015)).

-7-

employee gets discharged for his or her expressive conduct, we apply [the] *Pickering-Connick* [test]." *Id.*

In their complaints, Curtis and Bruce both alleged that (1) they "engaged in activity protected under the First Amendment and Missouri law by supporting a political candidate and speaking on that candidate's behalf"; (2) "Cole's termination of [their] employment was an adverse action that would chill a person of ordinary firmness from continuing in the activity of supporting Defendant Cole's political rivals"; and (3) "Cole's termination of [their] employment was motivated in whole and/or in part by [their] public endorsement and support of Keith Mills for Christian County Sheriff." Am. Compl. at 5, *Curtis v. Christian Cty.*, No. 6:17-cv-03072-SRB (W.D. Mo. July 26, 2018), ECF No. Doc. 122; Am. Compl. at 4–5, *Bruce v. Cole*, No. 6:17-cv-03073-SRB (W.D. Mo. July 24, 2018), ECF No. 112. The district court applied the *Elrod-Branti* test to Bruce's and Curtis's wrongful-discharge claims, characterizing their terminations as political patronage dismissals. On appeal, Cole and Christian County assert that the district court erred in the way it applied the *Elrod-Branti* test. We agree.[5]

"Under *Branti*, a government employer can take adverse employment actions against employees for protected First Amendment activities if they hold confidential or policymaking positions for which political loyalty is necessary to an effective job performance." *Shockency v. Ramsey Cty.*, 493 F.3d 941, 950 (8th Cir. 2007). The question is not whether a particular person can be "label[ed] 'policymaker' or 'confidential.'" *Id.* (quoting *Branti*, 445 U.S. at 518). Instead, the question is

_____

[5]Alternatively, Cole and Christian County argue that the *Pickering-Connick* test applies to Bruce's claim based on Bruce's accusation that Cole was a thief and his statement that "[i]f you elect Brad Cole[,] you're trading one crook for another." Pl.'s Sugg. in Opp'n to Defs.' Mot. for Summ. J. at 19, ¶ 61. We need not reach this issue based on our conclusion that the district court erred in its application of the *Elrod-Branti* test to the wrongful-discharge claims.

"whether political loyalty is an 'appropriate requirement for the effective performance of the public office involved.'" *Id.* (quoting *Branti*, 445 U.S. at 518). "[T]he proper focus is on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Bauer v. Bosley*, 802 F.2d 1058, 1064 (8th Cir. 1986) (internal quotation omitted).[6] The "nature of the plaintiff[s'] . . . job[] [may be] clear from the record" such that we can determine the issue as a matter of law. *Id.* at 1062.

"Some . . . circuits have determined that deputy sheriffs held policymaking positions and could be transferred for political reasons . . . ." *Shockency*, 493 F.3d at 950. These cases "turned on state law provisions in [their respective] jurisdictions." *Id.* at 951 (citing *Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc); *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989)).

In *Jenkins*, the Fourth Circuit examined "the role of deputy sheriffs" under North Carolina law and "conclude[d] that in North Carolina, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable." 119 F.3d at 1164. Therefore, the court held that "such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the *Elrod-Branti* exception to prohibited political terminations." *Id.* In determining that political affiliation was an appropriate job requirement for a deputy sheriff under North Carolina law, the court first recognized that the sheriff was

_____

[6]*Horton v. Taylor*, 767 F.2d 471 (8th Cir. 1985), is not to the contrary. In *Horton*, we stated that "[t]he *Branti* test is a functional one, focusing on the actual duties an employee performs." *Id.* at 477. But we "made this statement in the context of discussing the differences between road graders and deputy sheriffs, not between an individual plaintiff-employee's job description and the same employee's actual duties." Bryan R. Berry, *Donkeys, Elephants, and Barney Fife: Are Deputy Sheriffs Policymakers Subject to Patronage Termination? Diruzza v. County of Tehama*, 66 Mo. L. Rev. 667, 678 n.91(2001) (citing *Horton*, 767 F.2d at 477).

"elected by popular vote" in North Carolina. *Id.* at 1162. Because "the electorate vests in the sheriff broad discretion to set and implement the policies necessary to carry out his goals," "[t]he sheriff owes a duty to the electorate and the public at large to ensure that his espoused policies are implemented." *Id.* In turn, "[d]eputy sheriffs play a special role in implementing the sheriff's policies and goals." *Id.* Deputy sheriffs may act as a "core group of advisors" to the sheriff, "exercise[] significant discretion" when performing patrol duties, and "make some decisions that actually create policy" during the "course of their duties." *Id.* (internal quotation omitted). "The sheriff relies on his deputies to foster public confidence in law enforcement" and "to provide the sheriff with the truthful and accurate information he needs to do his job." *Id.*

Next, the court examined the specific roles of sheriffs and deputies under North Carolina law. *Id.* at 1163. "The North Carolina legislature ha[d] declared that the offices of sheriff and deputy sheriff are of special concern to the public health, safety, welfare and morals of the people of the State" and "prescribed a mandatory procedure for filling vacancies in that office." *Id.* (cleaned up). Under North Carolina law, deputy sheriffs "hold an office of special trust and confidence, acting in the name of and with powers coterminous with [their] principal, the elected sheriff." *Id.* (internal quotation omitted). The sheriff is entitled to "appoint deputies to assist him" in performing "his official duties." *Id.* The sheriff is liable under North Carolina law for the deputies' misbehavior. *Id.* Because a sheriff is liable for his deputies' actions, the North Carolina legislature created deputies as at-will employees "who 'shall serve at the pleasure of the appointing officer.'" *Id.* at 1164 (quoting N.C. Gen. Stat. § 153A–103(2) (1996)).

After examining the role of deputy sheriffs, the court determined that a deputy sheriff under North Carolina law could properly be terminated for political affiliation under the *Elrod-Branti* test, explaining:

We hold that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity. Either basis serves as a proxy for loyalty to the sheriff.

We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign for the candidate's opponent. That is the exact measure employed by [the] [s]heriff . . . in this case. The deputies admit that they campaigned on behalf of [the sheriff's] opponents. "It was never contemplated that . . . sheriffs . . . must perform the powers and duties vested in them through deputies or assistants selected by someone else," and we do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him.

*Id*. at 1164–65 (fifth and sixth alterations in original) (footnotes omitted).

The court "limit[ed] dismissals based on [its] holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." *Id.* at 1165. The purpose of this limitation was "to caution sheriffs that courts examine the *job duties of the position*, and *not merely the title*, of those dismissed." *Id.* (emphases added).

In summary, when applying the *Elrod-Branti* test to the position of deputy sheriff, the Fourth Circuit "look[s] to the electorate's approval of the policies on which the sheriff ran and the duties and responsibilities of the deputy sheriff in implementing those policies and priorities. [I]t then examine[s] the law of [the state] concerning the relationship between sheriffs and their deputies." *McCaffrey v. Chapman*, 921 F.3d 159, 167 (4th Cir. 2019).

Like the Fourth Circuit, the Eleventh Circuit has "concluded that political loyalty is an appropriate requirement for the job of deputy sheriff because of the

'closeness and cooperation required between sheriffs and their deputies' in fulfilling overlapping duties." *Ezell v. Wynn*, 802 F.3d 1217, 1222 (11th Cir. 2015) (quoting *Terry*, 866 F.2d at 377; citing *Silva v. Bieluch*, 351 F.3d 1045 (11th Cir. 2003); *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir. 1997)). The court "first applied the *Elrod-Branti* standard to the dismissal of Alabama deputy sheriffs in *Terry v. Cook*." *Id.* at 1224.

> [The court] concluded as a matter of law that political loyalty was an appropriate requirement for the job, relying primarily on the overlap in sheriffs' and deputies' duties under Alabama law, the sheriff's civil liability for actions taken by deputies in the course of performing their duties, and the more abstract observation that "[t]he deputy sheriff is the alter ego of the sheriff."

*Id.* at 1124 (quoting *Terry*, 866 F.2d at 377).

The Eleventh Circuit applies a categorical approach in which it "considers only what the subordinate is legally empowered to do under state or local law, that is, not a snapshot of the position as it is being carried out by a given person at a given point in time under a given elected official." *Id.* at 1225 (cleaned up). Under this categorical approach, "the viability of [a deputy sheriff's] claim turns on the role of a deputy sheriff under [the relevant state] law." *Id.* According to the court, its "task is to review [state] law to determine if a deputy sheriff has the same powers and duties as the sheriff and is thus the 'alter ego' of the sheriff." *Id*. If so, the deputy sheriff's First Amendment claim is foreclosed. *Id.*

Like the Fourth and Eleventh Circuits, we have examined the role of a deputy sheriff under state law to determine whether political loyalty is a requirement. *See Nord*, 757 F.3d at 744; *Shockency*, 493 F.3d at 951. In *Nord*, we observed that the *Elrod-Branti* test "d[id] not support" a North Dakota deputy sheriff's claim that his First Amendment rights were violated when the sheriff terminated him.757 F.3d at

-12-

744. We explained that application of the *Pickering-Connick* test was appropriate to the "intermixed case" based on the deputy sheriff's claim "that he was fired in accordance with the 'unwritten rule' [that deputy sheriffs who run against the sheriff will be fired] and for statements he made along the campaign trail." *Id.* But even under that test, we noted, "the employee's status as a policymaking or confidential employee, traditionally considered under the *Elrod/Branti* test, weigh[ed] in favor of the government's side of the balancing scale." *Id.* (internal quotation omitted). Ultimately, we concluded that "the nature [of the North Dakota deputy sheriff's] position is more similar to that of the deputies in *Jenkins v. Medford*, where deputy sheriffs were fired for campaigning for the sheriff's opponents." *Id.* Like "the North Carolina deputy sheriffs [in *Jenkins* who] acted as agents for the sheriff," so too did the North Dakota deputies. *Id.* "For reasons similar to those expressed in *Jenkins*," we determined that "loyalty is an appropriate requirement for the deputy sheriff position in [North Dakota]." *Id.* As a result, "the confidential nature of [the North Dakota deputy's] employment weigh[ed] heavily on the government's side of the *Pickering/Connick* balancing." *Id.* We held that the sheriff was entitled to qualified immunity because he did not violate the deputy sheriff's "clearly established constitutional right." *Id.*

In *Shockency*, however, we distinguished *Jenkins* and *Terry* "because they turned on state law provisions [in North Carolina and Alabama]," while the *Shockency* case turned on Minnesota law. 493 F.3d at 951. Minnesota law provides that the position of deputy sheriff is "in the classified service and . . . not based on political affiliation." *Id.* The position of deputy sheriff is "subject to open application and examination." *Id.* By comparison, the positions of sheriff's chief deputy, principal assistant, and personal secretary are in the unclassified service and subject to "discharge without cause with no right to a grievance appeal." *Id.* Deputy sheriffs, as classified service employees, cannot be forced "to contribute to campaign funds, or [be] discipline[d] . . . or retaliate[d] against . . . if they choose not to contribute." *Id.* (citing Minn. Stat. § 383A.297).

In addition, Minnesota law "prohibits public officials from using official authority or influence to compel employee participation in political activities or to impose or enforce additional limitations on the political activities of their employees." *Id.* (cleaned up). We concluded that "[t]he right of public employees to be free from coerced participation in political activity reasonably includes the right to participate willingly in the political sphere. The relevant Minnesota statutes were published and available to appellants, and the legislature's intent not to permit retaliation for political reasons was clearly expressed." *Id.* Accordingly, we determined that "a reasonable official would not have thought that [the deputy sheriffs] held policymaking positions and could not have reasonably relied on that exception in taking adverse employment actions against them." *Id.* We held that the law was clearly established; therefore, the district court did not err in denying qualified immunity to the sheriff on the wrongful-discharge claims. *Id.*

To determine whether deputy sheriffs in Missouri "hold confidential or policymaking positions for which political loyalty is necessary to an effective job performance," *id.* at 950, we must look to the role of the deputy sheriff under Missouri law. *See id.* at 951. Sheriffs in Missouri are elected officials. *See* Mo. Rev. Stat. § 57.010. Missouri sheriffs "are empowered to appoint their deputies by [§] 57.201.1, RSMo 1978. They are [the sheriff's] agents who 'hold office at the pleasure of the sheriff.'" *Linkogel v. Baker Prot. Servs., Inc.*, 626 S.W.2d 380, 385 (Mo. Ct. App. 1981) (quoting Mo. Rev. Stat. § 57.201.2). The deputies aid the sheriff in "the proper discharge of the duties of his office." Mo. Rev. Stat. § 57.201.1. In fact, "[t]he deputy sheriff has 'all the powers and may perform any of the duties' of the sheriff." *Tyler v. Whitehead*, 583 S.W.2d 240, 243 (Mo. Ct. App. 1979) (per curiam) (quoting Mo. Rev. Stat. § 57.270 ("Every deputy sheriff shall possess all the powers and may perform any of the duties prescribed by law to be performed by the sheriff.")).

Under Missouri law, a deputy sheriff is the alter ego of the sheriff. *See Jones v. Buckley*, 425 S.W.2d 204, 207 (Mo. 1968) (en banc) ("It is our opinion that the motion to dismiss should have been sustained. The summons and the notice were served on Buckley by a deputy sheriff who, in law, was the alter ego of the contestant, Jones."). According to the Missouri Supreme Court:

> It is an undoubted principle, that the master is not liable for the wanton acts of those whom he may employ. If an agent, transcending the limits of his authority, wantonly commits a trespass, his principal is not liable to an action for such wrong; *but the sheriff is liable for all acts done by his deputy, as such*; *for all abuses, for every perversion of the authority with which he is entrusted, he is liable, though they may be committed by his deputies. He is responsible for all trespasses done by a deputy, by color of his office. This is a well established principle*.

*State, to Use of Russell v. Moore*, 19 Mo. 369, 371–72 (1854) (emphasis added).

"The sheriff . . . has the final decision-making authority [to terminate a deputy sheriff]." Mo. Rev. Stat. § 57.275.1. Under § 57.275.1, the sheriff should provide a full-time deputy sheriff with written notice of the grounds of termination, and the deputy sheriff may request a hearing before the hearing board. The sheriff then reviews the hearing board's factual determination. *Id.* But "[t]he procedural requirements created [under § 57.275] shall not be interpreted as creating any new substantive due process rights." *Id.* § 57.275.2. The statute does not "confer[] or creat[e] an employment status for deputy sheriffs other than at-will status." *Id.* As the Missouri Supreme Court has explained:

> Although there is to be a hearing, and findings of fact are to be made, and the sheriff must review those findings, the sheriff still "has the final decision-making authority," and the statute does not subject that decision to any gauge or criteria. Indeed, absent such statutory direction, the sheriff can terminate the deputies even in the face of findings that wholly support the deputy's continued employment. In other words,

even in view of the mandated hearing, the deputies are no less at will employees. That is, they are employees who can be terminated for cause or for no cause at all, absent, of course, any recognized public policy exception.

*McCoy v. Caldwell Cty.*, 145 S.W.3d 427, 428–29 (Mo. 2004) (en banc).

The role of the deputy sheriff under Missouri law is substantially similar to the role of the deputy sheriffs in *Jenkins* and *Terry*; therefore, as deputy sheriffs, Curtis and Bruce held "policymaking positions for which political loyalty is necessary to an effective job performance." *Shockency*, 493 F.3d at 950. First, Missouri sheriffs are elected. As the Fourth Circuit explained, the "interplay between the voters, the sheriff and his policies, and the role of deputies in implementation of policy" demonstrates "that political affiliation and loyalty to the sheriff are appropriate job requirements." *Jenkins*, 119 F.3d at 1163.

Second, just as in *Jenkins* and *Terry*, Missouri deputy sheriffs assist the sheriff in the performance of his duties. *See id.* at 1163; *Terry*, 866 F.2d at 377.

Third, sheriffs in Missouri, like the sheriffs in *Jenkins* and *Terry*, are liable for their deputies' actions; the deputies are the sheriffs' alter egos. *See Jenkins*, 119 F.3d at 1164; *Terry*, 866 F.2d at 377.

Fourth, just like the deputy sheriffs in *Jenkins*, Missouri deputy sheriffs are at-will employees who serve at the pleasure of the sheriff. By contrast, the deputies in *Shockency* were "in the classified service," "subject to open application and examination," and "protected by a collective bargaining agreement that prohibited appellants from discriminating against them for their political beliefs and from disciplining or discharging them except for just cause." 493 F.3d at 951 (internal quotation omitted).

Fifth, no dispute exists that Bruce and Curtis are law enforcement officers. Bruce was a deputy sheriff employed as a detective, and Curtis was a deputy sheriff employed as a sergeant. Thus, just as in *Jenkins*, they were "deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." 119 F.3d at 1165.[7]

Because Curtis and Bruce, in their role as Missouri deputy sheriffs, held "policymaking positions for which political loyalty is necessary to an effective job performance," Cole was permitted to "take adverse employment actions against [them]" and did not violate their constitutional rights. *Shockency*, 493 F.3d at 950.

_____

[7]Missouri law setting forth the political activity rights of "first responders" does not alter our analysis. *See* Mo. Rev. Stat. § 67.145. It provides:

1. No political subdivision of this state shall prohibit any first responder from engaging in any political activity while off duty and not in uniform, being a candidate for elected or appointed public office, or holding such office unless such political activity or candidacy is otherwise prohibited by state or federal law.

2. As used in this section, "first responder" means *any person trained and authorized by law or rule to render emergency medical assistance or treatment*. Such persons *may include*, but shall not be limited to, emergency first responders, police officers, sheriffs, *deputy sheriffs*, firefighters, ambulance attendants and attendant drivers, emergency medical technicians, mobile emergency medical technicians, emergency medical technician-paramedics, registered nurses, or physicians.

*Id.* (emphasis added).

This statute is addressed to the political activity rights of "first responders." *Id.* § 67.145. Neither Bruce nor Curtis submitted evidence that they are a "first responder," i.e., a "person trained and authorized by law or rule to render emergency medical assistance or treatment." *Id.* § 67.145.2.

-17-

The district court, therefore, erred in denying Cole qualified immunity on their wrongful-discharge claims.

## B. *Christian County*

We also have pendent jurisdiction over the municipal claims against Christian County because they are "inextricably intertwined" with the qualified immunity issue. *See Hinshaw v. Smith*, 436 F.3d 997, 1002 (8th Cir. 2006). Bruce and Curtis seek to hold Christian County liable under a theory that Cole was the final policymaker for Christian County. "[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable." *Muir v. Decatur Cty.*, 917 F.3d 1050, 1054 (8th Cir. 2019) (internal quotations omitted). Because we hold that Cole did not violate Curtis's and Bruce's constitutional rights, Christian County is entitled to summary judgment on the claims against it. *See id*.

## III. *Conclusion*

Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____